UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DA VONTE LOVE,

        Plaintiff,

v.                                               Case No. 11-C-882

JOHN DOE 1, JOHN DOE 2, and
KEVIN NYKLEWICZ,

        Defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. 111) AND DISMISSING CASE

The *pro se* plaintiff, Da Vonte Love, has filed this civil rights action pursuant to 42 U.S.C. § 1983. He was granted leave to proceed *in forma pauperis* on a claim of deliberate indifference to a serious medical need related to defendants' alleged failure to provide him with Huber release from confinement for medical appointments. Plaintiff's amended complaint, filed November 27, 2013, is the operative complaint in this action.[1] Defendants have filed a motion for summary judgment. For the reasons explained herein, the court will grant the motion.

I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.,*

---

[1] The amended complaint also advanced a claim under the Americans with Disabilities Act (ADA). However, the court did not permit plaintiff to proceed on an ADA claim because he failed to state a claim under the statute. (Doc. 92 at 2-3.)

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. FACTS[2]

The amended complaint names as defendants John Does 1-2, who plaintiff alleges are Classification Officers, and Kevin Nyklewicz. Although currently employed with the Milwaukee County Sheriff's Office ("MCSO") as the Deputy Inspector of the Milwaukee County Jail ("MCJ"), at all times relevant to the amended complaint, Nyklewicz was the Captain of MCJ. For a period from March 2009 through December 2009, Nyklewicz was assigned to the County Correctional Facility-South ("CCF-S"); however, he was still the

---

[2] Facts are taken from plaintiff's amended complaint and Defendants' Proposed Findings of Fact. Defendants' proposed facts are undisputed.

Captain of the Jail. During Nyklewicz's assignment to the CCF-S, he was responsible for the day-to-day operations of CCF-S, and at all times relevant, he was responsible for the day-to-day operations of the MCJ. At no time in 2008 or 2009 was Nyklewicz responsible for ensuring inmates with Huber privileges were released for appointments and/or employment because he was never responsible for the day-to-day operations of the Huber program.

Since 2005, plaintiff was granted Huber privileges in five cases in Milwaukee County. These cases are *State of Wisconsin v. DaVonte Love*, Milwaukee County Case Numbers 07CM006562, 08CF004476, 08CM000902, 08CM005486, and 08CM005857. Plaintiff was incarcerated at the MCJ and the House of Corrections (HOC) from August 8, 2007, to May 21, 2008, at which time he served his sentence in 07CM006562 and had Huber privileges from April 21, 2008 to May 21, 2008. Plaintiff returned to Milwaukee County custody and was incarcerated from June 5, 2008, to June 22, 2008, and from August 31, 2008, to September 22, 2008; however, he did not have any Huber privileges at this time. Plaintiff again was incarcerated with the MCJ on October 3, 2008, through December 22, 2009. He had Huber release privileges for work, substance abuse, medical treatment, and mental health treatment from November 21, 2008 to September 25, 2009, and from October 26, 2009 to December 22, 2009. Plaintiff's Huber privileges extended to include education and job training from March 19, 2009 to December 22, 2009. He was not actively employed during this time, so his Huber privileges for this type of release would not have occurred.

A. Huber Program

In 2008, the Huber program was under the jurisdiction of the HOC. Then-Superintendent of the HOC, Ronald Malone, and the then-Milwaukee County Executive, Scott Walker were in charge of the program in 2008. The program was administered through the CCF-S and after that facility verified a Huber inmate's appointments, the inmate was transferred to the Community Correctional Center ("CCC") for release to said appointments. The CCF-S and the CCC were under the control of the Superintendent of the HOC.

On January 1, 2009, jurisdiction of the Huber program was transferred to the Milwaukee County Sheriff and the Captain. The CCC facility shut down and as of January 1, 2009, inmates exercising Huber privileges were released from the MCJ instead of CCC. In 2009, all Huber inmate releases were vetted for security concerns, appropriateness, compliance with judicial orders and MCSO policy, in addition to appropriate travel time. An inmate would not be released for any Huber privilege until an appointment/schedule had been faxed to the MCJ or the HOC, and the appointment/schedule was verified.

There were different processes involved when verifying appointments/schedules for an inmate actively exercising Huber privileges and an inmate not actively exercising Huber privileges. When the inmate was actively exercising his or her Huber privileges, and the inmate was housed in a Huber facility and had active, continuing appointments and/or an occupation that necessitated release to attend such appointment/occupation, the verification process was handled by the classification officers at the CCC in 2008 and the MCJ in 2009. Any appointments requiring release from the CCC or the MCJ had to be faxed a minimum of forty-eight hours in advance. When verifying appointments, the

4

classification officer would check the court order to discern the type of Huber release for which the inmate was eligible, ensure the fax received was on company letter head, and call to verify the authenticity of the schedule or appointment. If no answer was received, a message would be left instructing the supervisor employed at the appointment location to call the classification officer to verify the information. After the classification officer spoke with a supervisor from the company identified on the faxed schedule/appointment, he or she would sign and timestamp the letterhead indicating the information was verified.

The verification process was handled by the classification officers at the CCF-S when the inmate was not actively exercising Huber privileges that were court-ordered, and the inmate did not have active appointments and/or an occupation that necessitated the inmate's occupancy in a Huber facility. Inmates who were not already in the Huber program, but were attempting to exercise privileges had a longer involvement process. In such instances, after a fax of an appointment on company letterhead has been verified, the classification officer will go to where the inmate is housed and have the inmate sign the Huber rules. When the rules had been signed by the inmate, the classification officer would verify with Huber staff that there was sufficient bed space available to accept the inmate in the Huber facility, which housed 128 males in 2009. This limited bed space is why transfers to the Huber facility would only occur for inmates actively exercising their Huber privileges. If an inmate provided documentation for only one confirmed activity an immediate transfer would not be guaranteed . An inmate would have to provide an actively recurring schedule to be moved into and remain in the Huber facility. Without this limitation, any inmate could be moved into the Huber facility for one appointment and never go out again thereby taking a Huber bed from other eligible inmates.

The CCF-S classification officer, as the officer responsible for ensuring inmates were transferred to the MCJ for various appointments, would then coordinate with the MCJ classification officers on the next available bus to transfer the inmate to that facility. Following the transfer of an inmate to MCJ, the Huber officers would bring the inmate, the inmate's property, and his or her Huber file to the third floor of the MCJ. The Huber officers would then search the property, issue a wristband, and change the inmate into Huber jail attire. The Huber officers would make sure all pertinent paperwork for the release of the inmate was present in the Huber file. The officers would then make a MCJ "128 card" – a documentation card for the Huber inmate detailing his or her schedule, type of Huber release, documented times in and out of the facility, as well as a facial picture for recognition purposes. The Huber officers would then assign the inmate a locker and provide the inmate with a lock. The Huber officers would then orientate the inmate to Huber policies and procedures, search the inmate, and escort the inmate to the housing unit. When the inmate was reviewing the rules on the informational sheet, the expectations pertaining to the inmate's specific Huber privileges would be provided verbally. Violation of any of these rules/expectations may result in the cancellation of Huber release privileges.

It is solely the inmates' responsibility to secure appointments for medical and/or mental health treatment outside of the jail setting if the inmates desire such treatment in accordance with their Huber privileges. Correctional staff do not secure medical and/or mental health appointments for inmates wishing to exercise Huber privileges. An inmate's discipline history and escape history are taken into account before an inmate is released into the community to ensure that an inmate who may be a threat is not released,

unsupervised, into the community. Additionally, before an inmate can exercise medical Huber privileges, he or she must have a release of information letter signed and sent to the medical office before being allowed out for medical appointments. However, an inmate may not be released for a demonstrated medical need that can be met at the jail as determined by the medical services unit. Verification of the inmate's attendance to all appointments was required. During 2008 and 2009, health services staff had little or nothing to do with the exercise of Huber privileges. Upon an inmate's return from an outside provider, health services staff would review records or prescriptions brought back by the inmate to determine what orders from the outside provider would be authorized.

B. Plaintiff's Huber Privileges

Plaintiff was granted medical Huber privileges on April 21, 2008. He signed his Huber information sheet on May 6, 2008, as required, before he could exercise any Huber privileges. The next day, plaintiff was issued an Inmate Pass to leave for a doctor appointment at the Froedtert Eye Institute. That same day, a fax was received by classification officers indicating plaintiff did not appear for his appointment at the Eye Institute and discipline resulted. On May 7, 2008, plaintiff was not in CCC custody from 1115 hours to 1600 hours even though he was not attending his appointment. On May 8, 2008, plaintiff was issued an Inmate Pass to leave for a doctor appointment with Dr. Scotsman. When he returned plaintiff did not provide documentation verifying his attendance at this appointment. Moreover, he was not in CCC custody from 0743 hours until 1740 hours. Plaintiff was sent back to the CCF-S on May 9, 2008, for his violation of the Huber and HOC policies and procedures by exiting the CCC for a medical appointment on two separate dates, but not attending those medical appointments. On May 12, 2008,

7

plaintiff was transferred to the MCJ and placed on maximum custody status for his Huber violations.

Eye Physician Associates, S.C., faxed a document indicating plaintiff had a routine eye exam appointment on December 19, 2008. There is no documentation on this fax indicating the appointment was verified by the Huber classification staff. As such, plaintiff would not have qualified for released for the December 19, 2008, eye exam appointment.

National Vision faxed documentation dated June 11, 2009, indicating plaintiff had a routine eye exam appointment on June 17, 2009. This appointment was verified on June 15, 2009. Another fax was received from Grange Vision also dated June 11, 2009, indicating plaintiff had another routine eye exam appointment on June 22, 2009. This appointment was verified on June 15, 2009.

There are no confirmed appointments for substance abuse, medical treatment, or mental health from December 20, 2008, through June 2009. Additionally, there is no documentation from educational and/or job training facilities in plaintiff's classification file until approximately June or July 2009. There were no faxes located in plaintiff's classification file for any medical appointments from June 23, 2009, to September 2009.

On September 8, 2009, Milwaukee County Circuit Court Judge Richard Sankovitz signed an order in Milwaukee County Case Numbers 08CF004476, 08CM00902, 08CM005486, and 08CM005857, stating, among other things, that "Love must provide the court with written proof that a doctor or other professional has ordered treatment for him for which he must be released" before the court would order the Milwaukee County Sheriff to release plaintiff from custody. (Defs.' Prop. Finding of Fact ¶ 169; Hein Aff. ¶ 71, Exh. 1058.)

A fax was received by classification officers from Stein Optical Express dated September 16, 2009, indicating plaintiff had another routine eye exam appointment scheduled for September 21, 2009. This appointment was not able to be verified as nothing is documented on the faxed appointment. As such, plaintiff would not have qualified for release for the September 21, 2009, appointment.

A fax was received by classification officers from Krsko Chiropractic Clinic dated September 16, 2009, stating plaintiff had an appointment on September 22, 2009. This appointment was not able to be verified as nothing was documented on the faxed appointment. As such, plaintiff would not have qualified for release for the appointment.

Classification officers received a fax allegedly from Stein Optical, although not on company letterhead as required for an inmate to be released on Huber, indicating plaintiff had an appointment for a routine eye exam on September 24, 2009. This appointment was not able to be verified as nothing is documented on the faxed appointment. As such, plaintiff would not have qualified for release for the September 24, 2009, appointment.

On September 25, 2009, Judge Sankovitz signed an order in Milwaukee County Case Numbers 08CF004476, 08CM00902, 08CM005486, and 00CM005857 suspending plaintiff's Huber privileges until October 25, 2009, assuming he did not receive any discipline during that thirty-day time period. (Defs.' Prop. Finding of Fact ¶ 180; Hein Aff. ¶ 75, Exh. 1062.)

On October 26, 2009, plaintiff signed a Huber informational sheet. On October 28, 2009, plaintiff was transferred from the CCF-S to the MCJ. Classification officers received a fax from Lasik Plus indicating plaintiff had an appointment on October 30, 2009. This appointment was verified twice: once on October 27, 2009, and again on October 30,

2009. Plaintiff was released for his October 30, 2009 appointment at Lasik Plus, was out of custody from 1108 hours to 1605 hours, and he supplied proof of his attendance at the appointment. Plaintiff had an appointment with Lasik Plus on November 11, 2009, but this appointment is noted as having been cancelled on October 30, 2009.

Classification officers received a fax from Krsko Chiropractic Clinic indicating plaintiff had an appointment on November 2, 2009. This appointment was verified on October 30, 2009, and plaintiff was released from custody on November 2, 2009, at 0927 hours to attend the appointment. Classification officers received a fax from Krsko Chiropractic Clinic indicating plaintiff called and cancelled his appointment at 11:26 a.m. on November 2, 2009, and rescheduled the appointment for November 6, 2009. Plaintiff was considered escaped from custody from November 2, 2009, at 1126 hours until November 4, 2009, at 1430 hours, at which time plaintiff was brought back into custody by the Milwaukee County Apprehension Unit. Plaintiff's whereabouts were unknown during this time. Plaintiff was booked into the MCJ following his escape on November 4, 2009, and placed in disciplinary housing.

There are no appointments for mental health treatment located in plaintiff's classification file. In June 2009, when plaintiff advised the case manager of his Huber privileges, the case manager directed plaintiff to the CCF-S staff. In October 2009, the case manager and psychiatric social workers attempted to assist plaintiff to make use of his Huber privileges for mental health appointments in the community. One of the problems was that plaintiff was required to have an appointment with a provider to be released from the facility; however, plaintiff was unable to obtain appointments for mental health services because he had no money for payment. The case manager referred

plaintiff to Impact (a program which might provide him with the financial resources needed to obtain outside mental health appointments) in an attempt to obtain funding.

C.     Medical and Mental Health Treatment in Custody

Plaintiff received extensive mental health treatment from jail psychiatric staff while in custody. (*See* Defs.' Prop. Findings of Fact ¶¶ 9, 11, 47, 52, 81, 82, 86, 102-105, 107-110, 112, 114, 116, 117, 119, 124-30, 132, 141-43, 152, 155, 159, 160, 170, 183-86, 199, 201, 202, 205, 207, 208, 210, 211, 215, 218, 219.) He also received extensive medical treatment from jail staff while in custody. (*See id.* ¶¶ 44-46, 48, 51, 53-55, 58, 60-61, 73, 77, 84, 85, 94-96, 115, 120-23, 133-39, 145-47, 153, 154, 158, 165, 175, 178, 181, 198, 203, 204, 209, 212, 219.) The details of these medical and mental health treatments are set forth in defendants' summary judgment brief. (*See* Defs.' Br., Doc. 113, at 16-31.)

Plaintiff's medical records document that he frequently complained of mental health problems. He was seen by both case managers and psychiatric social workers and he had numerous appointments with psychiatrists at the CJF and the CCF-S. Furthermore, plaintiff's medical records demonstrate that he refused his medications frequently. On one occasion plaintiff's fluoxetine was discontinued after he was found to be "cheeking" and a stash of fluoxetine was discovered in his cell during a cell search.

In Dr. Grebner's professional opinion[3], to a reasonable degree of medical certainty, plaintiff was provided with appropriate medical and mental health care while he was incarcerated. The medical professionals on staff consistently monitored plaintiff's conditions and responded to his requests for attention. He was prescribed different medications for his mental health needs, including fluoxetine, trazodone, risperodone, zydis, hydroxyzine, and mirtazapine. The care and treatment provided to plaintiff exceeded the standard of care. Further, at no time were plaintiff's needs for medical or mental health care ignored or denied.

The only reasons for evaluation by an eye care specialist following partial enucleation[4] are severe infections of the eye and gradual loss of volume of the globe resulting in an impaired cosmetic result. A review of plaintiff's medical records reveals that he did not suffer from any severe eye infection or gradual loss of volume of the globe in 2008 or 2009. Plaintiff scheduled or tried to schedule appointments on his own at St. Mary's, Stein Optical, National Vision Center, and the Grange Vision Center. The purpose

---

[3] Dr. Michael Grebner was the medical director of the Correctional Health Services for Milwaukee County at all times relevant and at times, provided plaintiff with medical care. In 2008 and 2009, Dr. Grebner was a member of the Society of Correctional Physicians and the Academy of Correctional Health Professionals. At that time, he was a Certified Correctional Health Professional. As such, he is qualified to opine as to the medical care plaintiff received in 2008 and 2009, and he reviewed all of plaintiff's medical records from the MCJ and the HOC over that time period to reach his medical opinion. Additional physicians and/or psychiatrists who provided plaintiff with medical care and treatment in 2008 and 2009 are Donald Stonefeld, M.D. and Mindas Siliunas, M.D., who both worked under Dr. Grebner's supervision.

[4] On December 10, 2008, plaintiff reported dryness and pain in the right eye that began following trauma to his right eye at age ten. He saw Nurse Practitioner Melissa Rubio for these complaints. Ms. Rubio noted a patch on plaintiff's right eye. During the December 10, 2008, appointment, plaintiff reported that he had undergone partial enucleation of the right eye following severe trauma to his eye suffered in a motor vehicle accident. Partial enucleation is a surgical procedure performed following severe trauma to the eye when restoration of vision is not possible. The contents of the eye are removed, an inert material is then placed inside the empty globe, and the globe is sewn closed. The alternative procedure enucleation involves removal of the entire eyeball and replacement of the eyeball with a prosthetic. Partial enucleation is thought to provide a better cosmetic outcome. Once either procedure has been performed, it is not possible to restore vision.

of these appointments is unclear because no medical treatment for the eye is necessary after a patient has undergone partial enucleation. Plaintiff's assertion that he was told he could have an eye transplant is nonsensical because there is no such procedure. Had an evaluation by Milwaukee County medical staff revealed a condition requiring the care of an eye specialist, he would have been referred for evaluation by an ophthalmologist at the Eye Institute at Froedtert Medical Center. However, a review of plaintiff's medical record indicates he was not suffering from a serious medical condition that necessitated care from an ophthalmologist. Optical centers such as Stein Optical, National Vision Center, and the Grange Vision Center, perform routine eye examinations only and do not treat eye diseases or any other serious medical conditions related to the eye.

Plaintiff attempted to arrange appointments at Krsko Chiropractic Clinic while he was incarcerated in September and November 2009. A review of plaintiff's medical record indicates he was not suffering from any serious medical condition that necessitated chiropractic care. Plaintiff stated he initiated these appointments because he had obtained Huber privileges through the courts.

While plaintiff was entitled to make appointments with outside providers, the Milwaukee County Correctional Health system does not depend upon inmate initiated appointments. When inmates initiate appointments for outside care, there is no opportunity for Milwaukee County staff to document findings on a referral form prepared for the outside provider. The inmate becomes responsible for his own transportation to the appointment. Moreover, the outside provider's findings are not automatically provided to Milwaukee County staff as information regarding the outside appointment is only provided to the County's medical staff at the initiative of the inmate. Finally, the inmate is

responsible for paying the provider's charges. Because of the difficulties inherent in a system in which inmates schedule appointments, all medically necessary outside inmate care is scheduled through the Correctional Health System in which Milwaukee County medical staff initiate referrals, obtain appointments, provide transportation to and from the appointment, receive evaluations and recommendations, and initiate appropriate orders in the inmate's medical record.

## III. ANALYSIS

Defendants contend that plaintiff cannot state a § 1983 claim as a matter of law because the most liberal reading of his amended complaint reveals only that defendants failed to comply with Wisconsin's Huber statute, Wis. Stat. § 303.08. They also contend that summary judgment for the Doe defendants should be granted because plaintiff has not substituted or made a reasonable effort to substitute the Does with any Milwaukee County employees, even though his discovery requests were answered with names of potential Milwaukee County employees. Defendants further contend that the court should grant summary judgment for Nyklewicz because plaintiff's amended complaint fails to adequately notify Nyklewicz of his claim and because plaintiff's Eighth Amendment rights were not violated. Lastly, defendants contend that qualified immunity precludes plaintiff's claims.

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately

indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 103).

Plaintiff's response does not address defendants' first argument that, at most, the amended complaint alleges failure to comply with Wisconsin's Huber statute. As indicated, the amended complaint alleges that the defendants refused to follow the judge's order regarding his Huber privileges. Specifically, the amended complaint asserts that the John Doe classification officers "who held my monthly review did not place me in Huber after reviewing my file and seeing I had Huber, this was done for over a year until the Judge who gave that order compelled the defendants to follow his order." (Am. Compl. at 3.) In addition, the amended complaint charges that defendant Nyklewicz "put a hold on that order in April 2010." (*Id.*)

In *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 784 (7th Cir. 2008), an inmate claimed that Portage County violated his due process rights by failing to seek a court order for the suspension of his Huber privileges after he was re-imprisoned. The court stated:

> The Huber statute states that "[a]ny person sentenced to a county jail for a crime . . . may be granted the privilege of leaving the jail during necessary and reasonable hours" for various work and medical related purposes. Wis. Stat. § 303.08(1). Pursuant to the same statute, "[t]he sheriff may refuse to permit the prisoner to exercise the prisoner's privilege to leave the jail as provided in sub. (1) for not to exceed 5 days for any breach of discipline or other violation of jail regulations." Wis. Stat. § 303.08(10).

> Domka has established that although it was Portage County's practice to seek a court order revoking an individual's Huber privileges for 60 days when it terminated his or her HDP participation, no such request was made in his case. The County's response is that as Domka had only 40 days remaining to serve, the 60 day court revocation was unnecessary. We need not assess the merits of this particular dispute. Portage County's departure in this case from its usual course of action may well provide Domka with an argument that the County failed to comply with the statute. However, this is not the proper venue in which, nor is a constitutional claim the proper vehicle by which, to make that claim. "Federal judges do not enforce state-created procedures in the name of the Constitution," *Gordon v. Degelmann*, 29 F.3d 295, 301 (7th Cir. 1994) (citation omitted), and a failure to comply with state procedural rules does not violate the federal constitution, *see Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002) and cases cited therein.

*Domka*, 523 F.3d at 784. Based on the foregoing, to the extent plaintiff bases his claim on defendants' failure to comply with Wisconsin state law, his claim is not cognizable under § 1983.

Plaintiff's medical care claim appears to be based on the denial of his release from jail on Huber for medical appointments. Defendant Nyklewicz is only alleged to have been personally involved in one incident, in April 2010. However, plaintiff's Huber privileges did not extend to April 2010 because he was released from custody on December 22, 2009, and was not granted Huber privileges in any of his subsequent convictions. It is undisputed that at no time in 2008 or 2009 was Nyklewicz responsible for ensuring inmates with Huber privileges were released for appointments and/or employment because he was never responsible for the day-to-day operations of the Huber program. Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

Even if Nyklewicz were personally involved in not granting plaintiff's requests for Huber privileges, the record reveals that there were fourteen instances in 2008 and 2009 when plaintiff attempted to exercise his Huber privilege and there is no indication that any of these appointments was for a serious medical need. Plaintiff has not submitted evidence to support a finding that he had a serious medical need or that defendants were deliberately indifferent. The record reveals that there are only two verified appointments for which plaintiff was not released from custody, and both were for routine eye examination appointments at optical centers that do not treat eye diseases or other serious medical conditions related to the eye.

According to plaintiff, he had a diagnosed mental illness that needed to be treated and "defendants all were aware of Huber release for mental needs." (Pl.'s Resp. Br., Doc. 123, at 5-6.) However, it is undisputed that plaintiff did not have any appointments for mental health treatment outside of jail. Psychiatric social workers assisted plaintiff when he requested help to schedule mental health appointments outside of the jail setting. Moreover, jail medical professionals treated him for his mental health issues during his confinement. Plaintiff received appropriate medical and mental health care at the jail. Indeed, the plaintiff failed to dispute that the care and treatment he received exceeded the standard of care. Consequently, he has not established a medical care claim against defendants.[5] *See Arnett*, 658 F.3d at 750-51. Therefore,

IT IS ORDERED that defendants' motion for summary judgment (Doc. 111) is GRANTED.

---

[5] Plaintiff also has not identified the John Doe defendants despite being provided with ample time and opportunity to do so.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. District Judge